Rockingham, }
June 21, 1938. }

### SALISBURY BEACH ASSOCIATES

*v.*

### RUSSELL LITTLEFIELD.

*Richard E. Shute* and *Edward R. Hale,* (of Massachusetts) (*Mr. Shute* orally), for the plaintiffs.

*Jeremy R. Waldron* and *Wyman P. Boynton* (*Mr. Boynton* orally), for the defendant.

PAGE, J.   The premises involved in these proceedings consist of a lot of land in Seabrook upon which the defendant has erected build-

ings. The defendant is in possession under a deed. The plaintiffs have title to Seabrook Beach under a chain which was definitely traced back to a conveyance dated in 1901, and their westerly boundary is the easterly line of the marshes situated westerly of the beach. The tract occupied by the defendant, if marsh-land, does not belong to the plaintiffs. The issue towards which most of the evidence was directed was that concerning the character of this tract. The defendant claimed that it was marsh, partly covered by sand blown from the plaintiffs' land since 1901.

The plaintiffs offered the testimony of John W. Durgin, a qualified surveyor, who testified that he had had recourse to a map made in 1902 by a deceased engineer and purporting to show the line between the high ground and marsh, to another map made in 1925 and to a third made by himself in preparation for the trial; that he had viewed the premises and noted a distinct and irregular line between the marsh and the high ground; that he was familiar with the deeds in the plaintiffs' chain of title. Having thus testified, the witness was asked this question: "Now from the, using the description in the deeds and the available maps, plus your study of that section bounding the boulevard, what opinion have you formed as to the location of the westerly boundary of the Associate Company's land?"

Upon objection, this colloquy took place: *"Court:* The question remains whether in fact he is in a much better position than the jury to judge on that. What do you say to that objection? *Mr. Shute:* Why, I feel—*Court*: Is he in any position to help the jury on that? *Mr. Shute:* It seems to me he is because he has made a thorough examination of it. *Court:* Well, the jury did this morning. I think I'll exclude the question subject to exception. Let me see Exhibit 5 please. [The deed to the plaintiffs]. That is, any information Mr. Durgin can give as to what he found when he surveyed of course is admissible but I doubt very much if his opinion here would be very helpful to the jury on the particular matter."

The exception must be overruled. The issue was, in effect, where the line was between sand and marsh at the time that line was adopted as a boundary, prior to the deed of 1901. The results of surveys, as far as admissible under the rules of evidence, the descriptions in the deeds, and examination of the present appearances were all relevant. When the question was asked, only the map of 1902 and the deeds in the plaintiffs' chain of title had been introduced. The two later maps had not been offered, and the witness

had given no testimony as to what they indicated. Assuming that upon all of the facts in the mind of the witness his opinion as to the location of the line in 1901 would have been helpful to the jury, it did not yet appear what facts the witness had in mind. As matters then stood the court could properly find that the opinion would not aid the jury. Moreover, the question might be understood as calling for the opinion of the witness as to the present dividing line between sand and marsh, and apparently was so understood by the court, whose idea was that the jury had made a thorough examination of it at the view and knew that fact as well as anybody. The court's finding was justified upon the principles laid down in *Davis* v. *Railroad*, 75 N. H. 467, *Paquette* v. *Company*, 79 N. H. 288, and *Gardner* v. *Company*, 79 N. H. 452.

The defendant claims to occupy the premises in dispute under a chain of title originating in a deed of two acres of marsh or thatch ground to John Dow in 1737. This tract remained in the Dow family until it was willed to Ruth J. Knight prior to 1907. By her this marsh was deeded to James C. Merrill, and by Merrill to one Crowell, who conveyed it back to Merrill in 1925. It was taxed to Merrill as the "Knight Marsh" in 1930, and was sold and deeded to the Town of Seabrook for non-payment of taxes. The defendant acquired title from the town in 1934.

It was the contention of the plaintiff that this "Knight Marsh" was located some quarter of a mile southwesterly of the premises occupied by the defendant, and the descriptions in the deeds from 1737 on, bear out that contention. In order to substantiate the contention, the plaintiffs called as a witness Thomas R. Owen, who was a selectman of Seabrook and who produced the assessment books showing that James C. Merrill was taxed for two acres of Knight Marsh only during the years 1927 to 1934.

Upon cross-examination Mr. Owen testified that he was selectman in 1902, when the owner under whom the plaintiffs claim desired the town to make an appraisal of the beach property; that the selectman and two appraisers followed the marsh line; that they had "two old gentlemen as the appraisers who could cut marsh and represented that they knew all of the marsh land adjoining the beach and we started at this first lot and it was called the Knight Marsh;" that River Street, which is the northerly boundary of the disputed lot, has been run through this lot called the Knight Marsh. To the introduction of this testimony no immediate objection was made.

Upon redirect examination, the witness stated that in going about the plaintiffs' property in 1902 no reference was made to any deed of marsh land, and that the Knight Marsh was identified solely on the "knowledge of Mr. Chase who owned land adjoining . . . from what he said." Then the plaintiffs drew from the witness the statement that if the Knight Marsh was bounded on Cross Beach (as it had been in all deeds prior to that from the town to the defendant), it could not be the property occupied by the defendant. The plaintiffs moved that the testimony as to the location of the Knight Marsh be stricken out as hearsay.

The declaration of the adjoining owner was by a "Mr. Chase." The only adjoining owner of 1902 named Chase was George Chase, who owned marsh located westerly of the disputed premises and who gave his property in 1903 to his son Harvey. It was testified that Harvey was one of the heirs of George Chase at the time of trial, so there was evidence of George's death. The declaration was therefore admissible under the exception to the hearsay rule permitting the introduction of declarations of deceased landowners as to matters concerning which they had the means of knowledge and which they had no interest to misrepresent. *Great Falls Company* v. *Worster*, 15 N. H. 412, 437, 438; *Melvin* v. *Marshall*, 22 N. H. 379, 381. The opinion of the deceased may have been based upon a common misunderstanding in the neighborhood. If so, there is occasion for the exercise of caution by the triers of the fact, but that goes to the weight rather than to the admissibility of the evidence. In this respect the declaration stands the same as the testimony of the living witness Dockham, owner of land adjoining the disputed premises on the south, that the disputed premises were known as the Knight Marsh, though after he saw Merrill's deed he so much doubted this understanding that he ceased to consider purchase from Merrill.

The defendant testified that during the twenty-six years he had known the locality the sand had increased "all over the beach." Subject to exception, he was then permitted to state that there had been changes on the east side of the highway which bounds the disputed tract on the east. The ground of the objection was that it was "wholly immaterial to the determination of this case, what happened on the east side." If there was any doubt that the "east side" was near enough to indicate a similarity of conditions which was relevant to what might have happened on the west side of the highway, it was removed by the later testimony of an expert geol-

ogist, to whom the locality was well known, that the drift of the sand in the prevailing winds was from the southeast.

After the geologist had testified, he was approached during recess and engaged in conversation by a juror, who was not recognized by the witness to be a juror. The conversation related wholly to the Desert of Maine. Nothing, it could be found, was said about the case on trial or any matter affecting it. The plaintiffs moved for a mistrial. After a hearing, at which it was conceded that the witness had acted in entirely good faith, the court found that the plaintiffs' rights would not be prejudiced at all by the conversation. The motion for mistrial was denied, subject to exception. No error is seen in the finding or the denial of the motion.

The plaintiffs moved at the close of the evidence for a verdict in their favor. After the verdict they moved that it be set aside. Both motions were denied, and the exceptions taken to their denial may be considered together.

Besides the evidence already referred to, there was evidence that the disputed premises had borne marsh grass. One witness testified that he had cut hay on them for "Mr. Dow" thirty years previously. The premises are bounded on the south by the Dockham property, which though filled in for building purposes, was formerly marsh. On the north the disputed premises are bounded by River Street, and it was in evidence that when the street was constructed within a dozen years the soil was marsh and had to be filled with sleepers covered with gravel. There was evidence that the highway east of the premises was constructed in marsh. There was evidence that when the defendant erected his buildings on the front of his lot he had to draw in two hundred and fifty loads of filling from the rear of his lot, and that the deepest part of the fill was seven feet. In digging up the sand for the fill, an old-fashioned hand-wrought tool was found at the depth of three feet.

The geologist described the present aspect of the disputed premises to be part marsh and part sand, the former, in its more continuous state, adjoining the south side and west end. There was more sand on the east end and the north side, but with pockets of marsh. He took borings in the sand at several points and found old marsh beneath. Near the southwest corner of one of the buildings, the auger raised from a depth of three and a half feet a bottle cap of relatively recent type. He gave it as his opinion that the disputed premises were "marsh covered by recently drifted sand," deposited within twenty-five to thirty years at the outside.

The issue was not whether the defendant, in possession under a deed from the town, could show a good title, but whether the plaintiffs have title. *Goulding* v. *Clark*, 34 N. H. 148, 155; *Graves* v. *Company*, 44 N. H. 462, 463; *Tilton* v. *Stanyan*, 57 N. H. 489, 490; *Lear* v. *Durgin*, 64 N. H. 618; *Weston* v. *Nevers*, 72 N. H. 65, 67.

The plaintiffs could prevail only by persuading the jury that the disputed premises were high land at the time their ancestor in title took the first deed bounding on the marsh. The character of the land in 1901, or possibly an earlier date, must determine the issue. Upon the evidence, the jury could clearly find that as late as 1901 the disputed premises were marsh and therefore not within the description of the deed under which the plaintiffs claim. There was no error in the rulings of the trial justice. *Wisutskie* v. *Malouin*, 88 N. H. 242.

*Judgment on the verdict.*

All concurred.